1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

10

11

12

| | |
|---|---|
| JESSE MEJIA, | |
| Plaintiff, | CASE NO. 2:23-cv-00204-JNW-BAT |
| v. | **REPORT AND RECOMMENDATION** |
| RYAN ALYSON, et al., | |
| Defendant. | |

13   Plaintiff, Jesse Mejia, a prisoner at the Monroe Correctional Complex-Twin Rivers

14 (MCC) proceeds *pro se* in this 42 U.S.C. § 1983 civil rights action. Dkt. 7. Plaintiff alleges that

15 employees at MCC, Defendants Alyson Ryan[1] (medical provider), Elke Jackson (Health

16 Services Manager (HSM)), Alex Costa (Facility Medical Director (HSM2)), and Mark Eliason

17 (Health Services Deputy Assistant Secretary), violated his Eighth Amendment rights by failing

18 to provide him adequate medical treatment.[2] *Id.* Defendants moved for summary judgment. Dkt.

19

20

21

22

23

---

[1] The Court notes that it appears Plaintiff inverted the Defendant's name in his complaint, identifying her as Ryan Alyson instead of Alyson Ryan. Defendants' answer and subsequently filed declarations and other evidence make clear that the Defendant's proper name is Alyson Ryan, an Advanced Registered Nurse Practitioner (ARNP) at MCC. Accordingly, the Court will refer hereinafter to this Defendant as Alyson Ryan or Defendant Ryan. The Clerk is directed to correct the name on the docket and in the caption to reflect Defendant's name as Alyson Ryan not Ryan Alyson.

[2] Plaintiff originally also named the Department of Corrections (DOC) as a Defendant, but the DOC was previously dismissed from the action. *See* Dkts. 20, 26.

21. Plaintiff has not filed any opposition. For the reasons below, Defendant's motion for summary judgment (Dkt. 21) should be GRANTED and the case DISMISSED with prejudice.

## BACKGROUND

Plaintiff alleges in July 2022, while housed at Stafford Creek Corrections Center (SCCC) he was treated by medical personnel for his knee replacement surgery and was provided with multiple medications, including "Methecain, Oxycoton [sic], and Muscle Relaxers from early through late July, 2022." Dkt. 7. He alleges he was transferred to MCC, arriving on July 27, 2022, and was immediately taken off of all of his prescribed medications by Defendant medical provider Alyson Ryan. *Id.* Plaintiff alleges that being taken off these medications returned him to his previous excruciating pain in his knee which he has endured for 7-months, and which began creating greater injury in his back and hip due to MCC staff's failure to continue treating his knee replacement. *Id.* He alleges due to his left knee replacement his left leg is shorter than his right leg and this causes extreme pain in both of his knees, leg, hip and up his back. *Id.* He also alleges he was denied a left foot raise to level out the length of his legs. *Id.*

He alleges he has submitted numerous kites and completed the grievance process. *Id.* Plaintiff alleges Defendant Costa, who responded to his Level 1 grievance, refused to assist him in gaining necessary medical treatment through his provider. *Id.* He alleges Defendant Jackson, who responded to his Level 2 grievance, also denied him assistance in receiving the medical treatment necessary. *Id.* He alleges Defendant Eliason asserted "falsely" that the Level 1 and 2 grievance responses were adequately investigated and responded to, leaving him without care for his surgically replaced knee. *Id.* Plaintiff alleges that as a result of Defendants' denial of treatment he has been and continues to be in pain and that this has also caused "permanent damage" to his back and hip. *Id.*

1    As relief, Plaintiff requests money damages and that Defendants be ordered to provide

2    him with immediate medical treatment for his knee and that all medications for pain be reissued.

3    *Id.*

4    Defendants move for summary judgment on the grounds that Plaintiff fails to establish a

5    constitutional violation. Dkt. 21. Defendants argue no genuine issue of material fact remains

6    regarding whether Defendants acted with deliberate indifference to Plaintiff's serious medical

7    needs.[3] *Id.* Plaintiff did not file any opposition to the motion.

8    **STANDARD OF REVIEW**

9    Summary judgment is supported "if the pleadings, the discovery and disclosure materials

10   on file, and any affidavits show that there is no genuine issue as to any material fact and that the

11   movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears

12   the initial burden to demonstrate the absence of a genuine dispute of material fact for trial.

13   *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A genuine dispute concerning a material fact

14   is presented when there is sufficient evidence for a reasonable jury to return a verdict for the

15   non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). A "material" fact

16   is one which is "relevant to an element of a claim or defense and whose existence might affect

17   the outcome of the suit," and the materiality of which is "determined by the substantive law

18   governing the claim." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626,

19   630 (9th Cir. 1987).

20   When the Court considers a motion for summary judgment, "[t]he evidence of the non-

21   movant is to be believed, and all justifiable inferences are to be drawn in [their] favor."

22

23   _____

[3] Defendants also assert they are entitled to qualified immunity. Dkt. 21. Because Plaintiff has failed to present a triable issue of fact regarding the alleged constitutional violations, the Court does not reach this issue.

1    *Anderson*, 477 U.S. at 255. Yet the Court is not allowed to weigh evidence or decide credibility.

2    *Id.* If the moving party meets their initial burden of identifying those portions of the record

3    which demonstrate the absence of a genuine issue of material fact, the burden then shifts to the

4    nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions,

5    answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a

6    genuine issue for trial.' " *Celotex*, 477 U.S. at 324 (citations omitted). An adverse party may not

7    rest upon the mere allegations or denials of his pleading; his or her response, by affidavits or as

8    otherwise provided in Fed. R. Civ. P. 56, must set forth specific facts showing there is a genuine

9    issue for trial. Fed. R. Civ. P. 56(e)(2).

10       In response to the motion for summary judgment, the nonmoving party is required to

11    present specific facts, and cannot rely on conclusory allegations. *Hansen v. U.S.*, 7 F.3d 137, 138

12    (9th Cir. 1993). The court must determine whether the specific facts that are presented by the

13    non-moving party, considered along with undisputed context and background facts, would show

14    that a rational or reasonable jury might return a verdict in the non-moving party's favor based on

15    that evidence. *Emeldi v. University of Oregon,* 698 F.3d 715, 728-29 (9th Cir. 2012).

16       A verified complaint may be used as an opposing affidavit under Rule 56, if it is based on

17    personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v.

18    McDonald*, 55 F.3d 454, 460 & nn. 10–11 (9th Cir. 1995) (treating plaintiff's verified complaint

19    as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746,

20    plaintiff stated under penalty of perjury that contents were true and correct, and allegations were

21    not based purely on his belief but on his personal knowledge). However, an unverified complaint

22    cannot be considered as evidence at the summary judgment stage. *See Lew v. Kona Hosp.*, 754

23    F.2d 1420, 1423 (9th Cir.1985) (a verified complaint may be used as an opposing affidavit under

Rule 56 to the extent it expresses personal knowledge of admissible facts but an unverified

complaint is insufficient to counter a summary judgment motion supported by affidavits);

*Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003) (the nonmoving party

cannot "defeat summary judgment with allegations in the complaint, or with unsupported

conjecture or conclusory statements."); *Moran v. Selig*, 447 F.3d 748, 759 (9th Cir. 2006) ("the

complaint in this case cannot be considered as evidence at the summary judgment stage because

it is unverified."); Fed. R. Civ. P. 56(c), (e).

　　　　To state a claim under 42 U.S.C. § 1983, a complaint must allege: (a) the conduct

complained of was committed by a person acting under color of state law, and (b) the conduct

deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the

United States. *See Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds*,

*Daniels v. Williams*, 474 U.S. 327 (1986). Section 1983 is the appropriate avenue to remedy an

alleged wrong only if both of these elements are present. *See Haygood v. Younger*, 769 F.2d

1350, 1354 (9th Cir. 1985).

## DISCUSSION

A.　　Legal Standard

　　　　Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary

and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal citation

omitted); *see Hudson v. McMillan*, 503 U.S. 1, 6 (1992). An Eighth Amendment medical claim

has two elements: (1) "the seriousness of the prisoner's medical need and [(2)] the nature of the

defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991),

*overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en

banc).

A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (quoting *Estelle*, 429 U.S. at 104). "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." *Id.* at 1059-1060.

If a plaintiff shows he suffered from a serious medical need, he must then show the prison officials responded to the need with deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Deliberate indifference to a prisoner's serious medical need requires "a purposeful act or failure to act on the part of the defendant." *McGuckin*, 974 F.2d at 1060. In other words, "[a] defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need." *Id.* A prison official, accordingly, will not be found deliberately indifferent to a prisoner's serious medical needs "unless the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

Deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or [ ] may be shown by the way in which prison physicians provide medical care." *Hutchinson v. U.S.*, 838 F.2d 390, 394 (9th Cir. 1988). If the prison's medical staff is not competent to examine, diagnose, and treat inmates' medical problems, they must "refer prisoners to others who can." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982); *see also Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) (per curiam); *Toussaint v.*

1    *McCarthy*, 801 F.2d 1080, 1111-12 (9th Cir. 1986), *abrogated in part on other grounds by*

2    *Sandin v. Conner*, 515 U.S. 472 (1995).

3          However, "[m]ere negligence in diagnosing or treating a medical condition, without

4    more, does not violate a prisoner's Eighth Amendment rights." *Hutchinson*, 838 F.2d at 394. The

5    Court also recognizes mere differences of opinion between a prisoner and prison medical staff or

6    between medical professionals regarding the proper course of treatment does not give rise to a §

7    1983 claim. *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004). "[T]o prevail on a claim

8    involving choices between alternative courses of treatment, a prisoner must show that the chosen

9    course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in

10   conscious disregard of an excessive risk to [the prisoner's] health.'" *Id.* (citing *Jackson v.*

11   *McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

12   B.     Evidence

13          Defendants present evidence that shows Plaintiff was arrested on July 14, 2022,

14   following a violation of his conditions of Graduated Reentry and arrived at Stafford Creek

15   Corrections Center (SCCC) on July 14, 2022. Dkt. 22 at ¶5, and Ex. 1. Prior to his arrest,

16   Plaintiff underwent left knee replacement surgery on July 8, 2022. Dkt. 23 at ¶5, and Ex. 1.

17   Plaintiff was prescribed Percocet (Oxycodone) by his surgeon and advised by the prescribing

18   physician to "Take as directed to manage pain but begin to taper down from the medication after

19   3 days. It can be refilled in the future but it is expected that you have weaned completely from

20   your pain medication by your two week post-operative appointment." *Id.*, Ex. 1 at 12.

21          On July 14, 2022, immediately following his arrest, Plaintiff was taken to Skagit Valley

22   Hospital for medical clearance due to his recent knee surgery. *Id.* at ¶6, and Ex. 2. The records

23   from this visit note that Plaintiff's leg was a normal post-operative appearance, he was okay for

REPORT AND RECOMMENDATION - 7

1    discharge and may weight bear as tolerated. *Id.* Plaintiff was then admitted to SCCC and

2    assigned to the infirmary/extended care observation unit from July 14, 2022 to July 22, 2022. *Id.*

3    at ¶7, and Ex. 3. While at SCCC, Plaintiff was prescribed a short-term prescription for

4    Oxycodone. *Id.* Plaintiff's prescription for Oxycodone routinely expired prior to this transfer to

5    MCC. *Id.* On July 22, 2022, while at SCCC, Plaintiff was also prescribed a two-week course of

6    methocarbamol, a muscle relaxer. *Id.* at ¶8, and Ex. 4. Plaintiff began taking methocarbamol on

7    July 22, 2022, with the 14 days ending on August 5, 2022. *Id.*

8         Plaintiff was transferred to Washington Corrections Center on August 8, 2022, and

9    subsequently transferred to MCC on August 12, 2022. Dkt. 22 at ¶5, and Ex. 1. Plaintiff's

10   prescription for Oxycodone and methocarbamol expired and/or were completed prior to his

11   transfer to MCC. Dkt. 23 at ¶7. Defendant Ryan states in her declaration that "both short acting

12   opiates, such as Oxycodon, and muscle relaxers are used on a short-term basis in the acute pain

13   phase after surgery and are not appropriate for long term use." *Id.* at ¶9.

14        In August 2022, Plaintiff sent two kites. In his first kite dated August 12, 2022, Plaintiff

15   indicated he needed to come in to get his knee and leg checked out and asked to be placed on the

16   call out. Dkt. 22, Ex. 2. The response to the kite, issued by a non-defendant, indicates that a

17   request had been sent to scheduling. *Id.* In his second kite, dated August 17, 2022, Plaintiff again

18   requested to be placed on the call out for his leg indicating he was not sleeping well at night due

19   to pain, he gets sharp pains in his upper leg, and the Gabapentin "isn't working." *Id.* On August

20   29, 2022, Plaintiff was seen by a non-defendant provider at MCC, PA-C Brukhis, for complaints

21   of left knee pain. Dkt. 23 at ¶11, and Ex. 5. PA-C Brukhis noted that "about a week ago"

22   Plaintiff noted increased left knee pain and increased difficulties with movement of the left knee.

23   *Id.* PA-C Brukhis observed the joint was "edematous and hot" and Plaintiff was unable to bear

weight and, noting concern regarding a "septic knee", sent Plaintiff to the Emergency Department for evaluation. *Id.* However, the provider at Evergreen Monroe Emergency Department noted that Plaintiff's knee did not appear infected, was not warm or hot, there was no significant tenderness, he had full range of motion and was ambulating, there was no evidence of DVT, compartment syndrome, neurovascular compromise, or displacement. *Id.*, Ex. 6. The Emergency Department provider indicated Plaintiff could be safely discharged with outpatient follow up with his surgeon. *Id.* at ¶12, and Ex. 6. There is no indication the provider recommended narcotic pain medication or muscle relaxers for Plaintiff. *Id.*

On September 3, 2022, Plaintiff sent a kite requesting the prescription for "Methecath[4] 500 mg" he was taking at SCCC and the "pain medication", noting that his knee and leg hurts and asked to be seen by the provider. Dkt. 22, Ex. 3 at 36. Defendant Ryan responded to the kite and notified Plaintiff that he would be placed on the schedule to discuss his knee pain. *Id.* Plaintiff was seen at Skagit Valley Hospital Orthopedic Surgery on September 14, 2022, by his orthopedic surgeon Michael Thomas, D.O. Dkt. 23 at ¶13, Ex. 7 at 74-77. Dr. Thomas stated that Plaintiff was progressing as expected post-surgery, that his motion was as expected but that Dr. Thomas would like him to work to improve his motion further given that he is only able to flex to 110 and extend to 0. *Id.* Dr. Thomas indicated a comprehensive knee exercise packet was given to Plaintiff to be done once daily and he further recommended twice weekly physical therapy (PT). *Id.* Dr. Thomas did not recommend that Plaintiff be prescribed narcotic pain medication. *Id.* Rather, he recommended topical diclofenac sodium to be used 1 to 4 times a day to help with knee pain and icing 4 times a day for 20 minutes. *Id.*

---

[4] Plaintiff appears to be referring to the muscle relaxer methocarbamol he was prescribed at SCCC.

1    Plaintiff was seen by Defendant Ryan at MCC health services for the first time on

2    September 19, 2022. Dkt. 23, Ex. 8. Defendant Ryan noted that Plaintiff complained of 6/10 pain

3    at rest and 8/10 pain when walking. *Id.* She noted he is using a wheelchair for ambulation but is

4    able to walk short distances while grabbing on to furniture to steady himself for support. *Id.* She

5    notes that Plaintiff indicated that at his September 14, 2022, appointment his orthopedic surgeon

6    recommended he start PT. *Id.* Defendant Ryan notes that Plaintiff had not been able to start PT

7    up until this point as he had not had clearance from the surgeon. *Id.* Defendant Ryan notes that

8    Plaintiff had a "delay in orthopedic follow-up s/p surgery so physical therapy and progress has

9    been delayed. Requested MAs to contact clinic for faxed note from surgery appointment, as soon

10   as it is received, orders will be placed for PT." *Id.* At Plaintiff's request, Defendant Ryan noted

11   she would write a Health Status Report (HSR) for extra pillow, sweatpants, and continuation of

12   low bunk/low tier for 3 months. *Id.* Defendant Ryan prescribed "Acetaminophen (Tylenol) 550

13   mg tabs, 2 tabs TID PRN for pain." *Id.* The records reflect Plaintiff was also prescribed

14   Gabapentin on September 30, 2023. Dkt. 23, Ex. 8 at 87.

15   Plaintiff sent a kite requesting to be seen again for knee pain on October 7, 2022, and

16   asking for a follow up for his knee pain as the Tylenol was not helping. Dkt. 22, Ex. 4 at 37. The

17   kite response indicates Plaintiff had an upcoming appointment with his provider and to watch for

18   call-out. *Id.* On October 8, 2022, Plaintiff sent a kite noting that his back was also hurting so

19   badly it was hard to move and that the pain is worse at night. *Id.* at 38. The kite response

20   indicated a request had been sent to scheduling. *Id.*

21   The record reflects Plaintiff was seen again at MCC health services on October 14,

22   2023.[5] Dkt. 23, Ex. 8 at 88. On October 25, 2022, the record shows Defendant Ryan prescribed

23

---

[5] The Court notes it is unclear from the record what provider he saw on October 14, 2023.

diclofenac gel for Plaintiff's knee pain. *Id.* at 89. Plaintiff sent another kite on November 7, 2022, asking to have his HSR for bottom bunk renewed, for a knee sleeve for both knees, to have his left leg checked because his left leg is longer than his right leg and his back and hip are hurting with sharp pains from his back down his right leg. Dkt. 22, Ex. 4 at 39. Defendant Ryan saw Plaintiff the same day, November 7, 2022, at MCC health services. Dkt. 23, Ex. 8 at 90. Defendant Ryan noted that Plaintiff had been cleared and authorized to attend outside twice weekly physical therapy consult on September 20, 2022, that scheduling had been delayed but that he was scheduled for "this month." *Id.* Defendant Ryan noted that Plaintiff described continued difficulty with ambulation due to knee and back pain. *Id.* She noted that Plaintiff indicated his legs are two different lengths since surgery and that it is causing Plaintiff low back pain. *Id.* She noted that she did not observe an appreciable difference in leg length on standing. *Id.* She noted Plaintiff complained of 8/10 right low back and left knee pain, that he uses a wheelchair for long distances and Plaintiff indicated he could only walk several yards before pain makes him stop. *Id.* She noted his left knee flexion to 90 degrees with pain, internal rotation of knee limited to approximately 10-15 degrees and atalgic gait favoring right leg. *Id.* She explained to Plaintiff she suspected increased low back pain was related to compensating for left lower extremity pain, informed him he was scheduled to begin more intensive outside PT, and prescribed Meloxicam 7.5 mg tab daily to try to achieve better pain control. *Id.*

Between the end of October and the end of January 2022, Plaintiff submitted and appealed a grievance/resolution request related to his knee and back pain. Dkt. 22, Ex. 7-8. On October 24, 2022, Plaintiff submitted a resolution request indicating he was scheduled to see a provider that day and it was cancelled. *Id*. He complains of pain in his back and knee and asks for appointments with a "specialist", to send him to a provider, to "fix his defective knee

1   replacement, and to treat pain management nerves damage." *Id.* The response indicates that an

2   appointment with Plaintiff's provider was rescheduled for the following week, and that he had

3   two scheduled off-site appointments for later in the month. *Id.* Plaintiff appealed to Level I on

4   November 6, 2022, stating he is in pain and needs something to be done. He requests orders for

5   proper scans, specialist and pain medication treatment, muscle relaxers, sleep aids etc. *Id.* The

6   Level I response from non-defendant L. Stemler, dated November 9, 2022, states:

> You['re] complaint cites that you have not received adequate care for your knee/pain issues. RN 3 Klimper was assigned to look into your concern, she met with you on 10/12/22 in the TRU A-unit CUS' office and reviewed noted documentation: Primary Encounter Reports (dated 8/12/22, 8/29/22, and 9/19/22), ER Visit notes from 8/29/22. Orthopedic notes from 9/14/22 appointment, and several Health Service kites.
>
> You transferred to TRU on 8/12/22. Health Services received kites form you on 8/15/22 [and] 8/18/22 requesting to be seen. You were placed in the scheduling queue. On 8/22/22 Medical received another kite from you asking to be seen and you were encouraged you to sign up for sick call. On 8/29/22 you were seen by a provider who wanted to rule out the possibility of you having an infection in your knee. The ER visit notes state that the pain you were feeling was postoperative pain and labs and imaging everything was OK with your knee. On 9/14/22 you had an off site consult with your orthopedic surgeon who stated your [sic] are progressing as expected. On 9/29/22 you were prescribed medication for your pain. It is unsubstantiated that MCC Health Services has not addressed you['re] knee pain/issues.

*Id.*

Plaintiff appealed to Level II on November 22, 2022, and Defendant Anderson responded

on December 13, 2022, that:

> This level I resolution fact-finding was completed by Health Service Manager (HSM) Jackson. The scope of your complaint is you allege you have not received adequate care for your knee pain/issues. You were interviewed at level I on 10/12/22. Level I fact-finding packet and response, including medication records, and Ortho notes from 11/17/22, were reviewed.
>
> You were seen on 11/17/22 by the Orthopedic surgeon and a follow-up appointment has been scheduled.
>
> I have reviewed the level I resolution findings and your medical records, and concur with the outcome. Your complaint remains unsubstantiated, you are

receiving appropriate care for your knee issues. You have an upcoming appointment regarding your knee.

*Id.*

Plaintiff appealed to Level III on January 4, 2023, and on January 31, 2023, Defendant Eliason responded that:

Level 1 and 2 responses were reviewed and adequately investigated. Your Level 3 appeal was reviewed on 1/20/2023. During this high level review, your initial Resolution Request, medical records, LV1-2 reviews, and all appeals were reviewed. This claim is unsubstantiated based on evidence available at the time of review. Review of records shows that no medically necessary care has been withheld. You have had appropriate evaluation and treatment of your knee by your primary care practitioner and orthopedic surgery specialist. Most recently (well after a level 3 appeal was requested) you were seen by orthopedic surgery who noted that no follow up was needed for your left knee. You will continue to have follow up with physical therapy and your primary care practitioner in the future.

*Id.*

Plaintiff was seen at the Everett Clinic on November 18, 2022, for a physical therapy evaluation. Dkt. 23 at ¶15, Ex. 9. The records indicate that Plaintiff presented with stable signs and symptoms and noted his prognosis was "excellent." *Id.* There is no recommendation that Plaintiff be prescribed any additional medication for pain. *Id.*

Plaintiff sent another kite requesting to be seen for his back pain on November 21, 2022, noting he is having nerve pain going down his legs and pins and needles in his hands and that his leg being "short" is making it worse. Dkt. 22, Ex. 5 at 40. Defendant Ryan saw Plaintiff on November 28, 2022, and increased his Gabapentin. Dkt. 23, Ex. 10 at 102-105. Defendant Ryan saw Plaintiff again on December 5, 2022, noting that he had been seen at his orthopedic clinic (Skagit Valley Ortho) on November 17, 2022[6], that x-rays taken showed stable hardware with no

---

[6] The Court notes that the November 17, 2022, record from Skagit Valley Ortho itself is not included with the records submitted in support of Defendant's motion for summary judgment.

REPORT AND RECOMMENDATION - 13

1   signs of loosening and that they had suggested he increase his Gabapentin and continue walking

2   for exercise. *Id.* She noted Plaintiff's pain was mostly in his back which he indicated had been an

3   issue for a long time but had worsened by limping due to his knee surgery. *Id.* She noted Plaintiff

4   had discontinued the meloxicam due to bloating and that she had recently increased his

5   Gabapentin for pain control at the suggestion of his orthopedist, but that it would take a month to

6   notice a difference in the increased dose. *Id.* She noted Plaintiff walked with atalgic gait using a

7   cane, favors his right side, and is able to bear weigh. *Id.* She noted Plaintiff is functional and able

8   to walk around the track and exercise at his increased Gabapentin dosage. *Id.*

9       Plaintiff sent another kite on January 9, 2023, noting that the Gabapentin was "not really

10  helping." Dkt. 22, Ex. 5 at 41. Plaintiff was seen at MCC Health Services the following day, on

11  January 10, 2023.[7] Dkt. 23 at ¶16, and Ex. 10. Plaintiff was seen at Skagit Regional Clinics by an

12  orthopedic physician's assistant on January 18, 2023. *Id.* at ¶17, and Ex. 11. The provider noted

13  that Plaintiff complained of stiffness, pain and swelling and that he felt his legs were different

14  lengths. *Id.* Plaintiff was noted to ambulate independently, that his range of motion was 0-120,

15  swelling was mild, that his incision was well healed, and he did not appear in acute distress. *Id.*

16  The provider noted an impression of "stable appearance of left TKA." *Id.* The provider further

17  indicated that "[p]atient is encouraged to continue to exercise on a regular basis to improve

18  strength and endurance. No further follow up needed for the left knee replacement." *Id.* The

19  provider noted it was "normal to still get some swelling and occasional pain." *Id.* X-rays were

20  also taken to address Plaintiff's concern regarding leg-length discrepancy. *Id.*

21      In a medical kite dated February 22, 2023, Plaintiff asked for any medical holds to be

22  removed stating that he did not have any more appointments with the outside provider

23

---

[7] It is not entirely clear from the record what provider Plaintiff saw on this date.

1    (orthopedics) and asked to have his provider place him back on the call out. Dkt. 22, Ex. 6. He

2    noted that he was recently scheduled to be seen but missed it due to the "safety muster." *Id.* The

3    response states that the hold has been removed and a referral placed for a provider visit. *Id.* In a

4    medical kite dated February 26, 2023, Plaintiff asked to be placed on the call out this week for a

5    follow up. *Id.* The response to the kite indicated Plaintiff was being rescheduled. *Id.* In a medical

6    kite dated February 28, 2023, Plaintiff stated he needed to get his L3s changes so he can go to

7    work release as soon as possible and asked to be placed on the call out. *Id.* In response to the kite

8    Defendant Ryan stated that Plaintiff had been scheduled for an appointment on February 17,

9    2023, but that he did not show up. *Id.* Defendant Ryan indicated she would do her best to have

10   him seen in the next week and to utilize sick call or a medical emergency if he needed to be seen

11   urgently. *Id.*

12         Plaintiff was again evaluated by Defendant Ryan at MCC Health Services on March 6,

13   2023. Dkt. 23, Ex. 12. Defendant Ryan noted that Plaintiff informed her that he is "eligible for

14   work release and would like to get out of his wheelchair." *Id.* Defendant Ryan noted that a bone

15   scanogram was ordered by the orthopedist at Plaintiff's January 18, 2023, visit. *Id.* She noted

16   that she did not receive the results until March 1, 2023, after reaching out to the clinic, and that

17   the results reflected a 2.9 cm leg length discrepancy. *Id.* She noted that she requested to schedule

18   a follow up appointment with the orthopedic surgeon to discuss this with Plaintiff and make a

19   recommendation as Plaintiff continued to report knee and low back pain. *Id.* She notes that:

20         Patient's physical therapy has also been delayed for reasons not clear to this
           provider – twice weekly physical therapy was ordered with a consult placed in
21         October 2022 when clearance from the surgeon was obtained. The first visit to
           outside PT occurred on 11/18/22, and patient declined his next appointment due
22         to a family visit on 11/28/22 – MA Jenelle noted this in OMNI and requested
           rescheduling, however, between the months of December until February 28th the
23         consult was not updated and no appointments were scheduled. He is now
           scheduled for 3/14/23 to return to physical therapy for his second formal visit.

REPORT AND RECOMMENDATION - 15

> This delay in care has been escalated to upper management through appropriate channels.

*Id.*

Defendant Ryan further notes that Plaintiff reports still using the wheelchair to get down to main line and pill line and that he uses a cane on the unit. *Id.* She notes that pain in the knee fluctuates and that that day his right lower back and hip bothered him more than his left knee, noting 4-5/10 pain with 3/10 pain on left lateral side of left knee. *Id.* She notes Plaintiff is taking Gabapentin and diclofenac gel for pain and that he had been trialed on naproxen and meloxicam which he discontinued due to side effects and/or lack of effectiveness. *Id.* She notes that he reported increased dosing of Gabapentin had not been helpful nor had the diclofenac gel. *Id.*

Defendant Ryan noted concern about Plaintiff's ability to participate in work release at this point due to his still requiring mobility devices, atalgic gait, muscle wasting to left calf and that, despite her best efforts, he had not completed a regular outpatient physical therapy program. *Id.* She notes he is hesitant to walk uphill and is at risk for falls. *Id.* She further notes that there has not yet been communication with the orthopedic surgery office regarding whether the leg length discrepancy needs to be addressed and she as scheduled an appointment there for April 2023 to address this. *Id.* Defendant Ryan noted that she discussed pain medications at length with Plaintiff including that certain medications such as muscle relaxers and opiates are used on a short-term basis in the acute post-operative period, and that other medications such as amitriptyline, duloxetine and gabapentinoids can be used for chronic pain or pain lasting longer than 3 months. *Id.* She noted that she suspected Plaintiff's pain as both musculoskeletal and neuropathic and suggested trying duloxetine for nerve pain management. *Id.* She indicated that Plaintiff agreed to try duloxetine and that she also renewed his extra strength Tylenol

prescription. *Id.* She noted that she encouraged Plaintiff to ambulate when possible and that she would issue a walker for longer distances and renewed his wheelchair and cane HSRs. *Id.*

Defendant Ryan further states in her declaration that following the expiration and completion of his short term prescriptions for Oxycodone and muscle relaxers, Plaintiff was given appropriate medications for pain control, including acetaminophen, diclofenac gel (nonsteroidal anti-inflammatory drug), Gabapentin (used to relieve nerve pain), meloxicam (a nonsteroidal anti-inflammatory drug) and duloxetine (used to relieve nerve pain). Dkt. 23 at ¶10.

Plaintiff failed to submit any opposition to Defendants' summary judgment motion. Furthermore, Plaintiff's complaint is unverified – it does not contain a sworn statement declaring under penalty of perjury, that the allegations are true and correct pursuant to 28 U.S.C. 1746. As such, the Court cannot consider the complaint as evidence in opposing defendants' motion for summary judgment.

C.    Analysis

Plaintiff alleges in his complaint that Defendant Ryan violated his rights by discontinuing his prescriptions for Oxycodone and methocarbamol and failing to adequately treat his knee, back and hip pain. He also appears to allege his rights were violated by the failure to provide him with a leg lift to address his leg length discrepancy which causes extreme pain in both of his knees, leg, hip and up his back. He alleges Defendants Costa (Facility Medical Director HSM2), Jackson (Health Service Manager), and Eliason (Health Services Deputy Assistant Secretary) are also responsible for these violations because they denied his grievances.

The evidence shows that, contrary to Plaintiff's assertions, Defendant Ryan did not discontinue Plaintiff's prescriptions for Oxycodone and methocarbamol. Rather, Plaintiff's prescriptions for Oxycodone and methocarbamol expired prior to his transfer to MCC. The

1    evidence further shows that the provider who prescribed the Oxycodone immediately after

2    Plaintiff's surgery intended for Plaintiff to have weaned off that medication by July 22, 2022,

3    several weeks prior his transfer to MCC. Defendant Ryan also states in her declaration with

4    respect to these medications that "both short acting opiates, such as Oxycodone, and muscle

5    relaxers are used on a short-term basis in the acute pain phase after surgery and are not

6    appropriate for long term use." Dkt. 23 at ¶9.

7           The evidence shows that during the visits in which Defendant Ryan personally treated

8    Plaintiff related to his knee (September 19, 2022, November 7, 2022, November 28, 2022,

9    December 5, 2022, and March 6, 2023), Plaintiff's complaints of pain were addressed and

10   current medications to address pain were increased or new medications were added to help

11   alleviate pain. Dkt. 23 at ¶19, and Exs. 8, 10 and 12. On September 19, 2022, Defendant Ryan

12   prescribed Plaintiff extra strength Tylenol, 500 mg and wrote a HSR for an extra pillow,

13   sweatpants and continuation of lower bunk. *Id.*, and Ex. 8. On September 30, 2022, Defendant

14   Ryan prescribed Plaintiff Gabapentin, and on October 25, 2022 prescribed diclofenac gel. *Id.* On

15   November 7, 2022, Defendant Ryan again addressed Plaintiff's complaints of pain and, with

16   Plaintiff's agreement, prescribed Meloxiam 7.5 mg tabs for pain. *Id.* On November 28, 2022,

17   Defendant Ryan increased Plaintiff's Gabapentin. Dkt. 23, Ex. 10 at 102-105. On December 5,

18   2022, Defendant Ryan noted that Plaintiff had discontinued the Meloxicam due to bloating but

19   that she had recently increased Plaintiff's Gabapentin for pain control at the suggestion of

20   Plaintiff's orthopedist and that it would take a month to notice a difference in the increased dose.

21   *Id.*

22          On March 6, 2023, Defendant Ryan discussed Plaintiff's complaints of pain and pain

23   medication at length, including the medications had been prescribed previously to address his

REPORT AND RECOMMENDATION - 18

pain. *Id.* at ¶20, and Ex. 12. Because Plaintiff reported that he was not feeling the benefit of the increased dosage of Gabapentin, Defendant Ryan suggested he try duloxetine nightly and also renewed Plaintiff's prescription for extra strength Tylenol. *Id.* at ¶19, and Ex. 12. The record shows that at each appointment, Defendant Ryan addressed Plaintiff's complaints of pain and worked to prescribe appropriate pain medication to better manage Plaintiff's pain. Dkt. 23.

The record also shows Plaintiff was seen by outside providers including Plaintiff's orthopedic surgeon and providers at the orthopedic clinic on several occasions after the initial prescriptions for Oxycodone and methocarbamol expired. There is no evidence any of these outside providers recommended Plaintiff be re-prescribed Oxycodone or other narcotic pain medication or muscle relaxers such as methocarbamol.

Plaintiff presents no evidence to rebut Defendants' summary judgment showing. Even if the Court were to consider the allegations set forth in Plaintiff's unverified complaint in opposing Defendants' motion for summary judgment, the fact that Plaintiff believes he should have been prescribed different, narcotic, pain medication and muscle relaxers is at best a disagreement with a course of treatment but fails to establish Defendant Ryan was deliberately indifferent to a serious medical need. *See Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (defendant doctor's change of prescription to an allegedly inferior drug failed to show deliberate indifference as a matter of law); *McMican v. Lewis,* 53 F.3d 338 (9th Cir. 1995) ("Although [plaintiff] disagreed with the type of pain medication he received, such disagreement is insufficient to give rise to a constitutional claim."); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (prisoner alleged a mere difference in medical opinion where prison doctor advised surgery and subsequent medical personnel treated him but did not recommend surgery); *see Parlin v. Sodhi*, No. 10-6120, 2012 WL 5411710, at *4–5 (C.D. Cal. Aug.8, 2012) (prisoner's

preference for a stronger pain medication, such as Vicodin or Tramadol, "represents precisely the type of difference in medical opinion between a lay prisoner and medical personnel that is insufficient to establish a constitutional violation"); *Lua v. LAC CSP Medical Officials*, No. CV10-3548, 2011 WL 1743260, at * 2–3 (C.D. Cal. March 23, 2011) (prisoner who was placed on "lesser medications" by prison doctors upon his transfer, instead of Tramadol or other pain relief medications, alleged merely a difference of medical opinion as to his preferred pain medication rather than an actionable Eight Amendment claim); *Ricker v. California Dep't of Corr.*, No. CV 09-9217, 2010 WL 5634316, at *2–3 (C.D. Cal. Dec.15, 2010) (claim that prisoner was prescribed certain pain medication by "another Doctor" but was later placed on a new pain medication by prison medical staff that allegedly "did nothing for [his] pain and suffering," was a disagreement with prison doctors regarding medical treatment that failed to state an actionable Eighth Amendment claim); *Mantigal v. Cate*, 2010 WL 3365735, at *5–6 (C.D. Cal. May 24, 2010) (prison medical staff decision to change pain medication prescribed at another institution from Tylenol with Codeine or Gabapentin (Neurontin), to regular Tylenol, failed to state actionable Eighth Amendment claim).

The evidence shows at best Defendant Ryan had a different opinion than Plaintiff regarding the appropriate, necessary treatment for Plaintiff's knee, back and hip pain. Plaintiff has not presented evidence showing Defendant Ryan's chosen course of treatment was medically unacceptable under the circumstances and was chosen in conscious disregard of an excessive risk to Plaintiff's health.

With respect to Plaintiff's assertion that he was "denied" a leg lift to address his leg length discrepancy, the Court notes that Plaintiff fails to identify when or from whom he allegedly requested a leg lift. To the extent Plaintiff alleges Defendant Ryan was deliberately

indifferent to his complaints of pain he asserts were caused by his leg length discrepancy, the record reflects that Defendant Ryan did not act with deliberate indifference. The record shows that on November 7, 2022, Defendant Ryan examined Plaintiff and did not observe a clear leg length discrepancy upon standing and informed Plaintiff she believed that his back pain was related to compensating for the pain in his left leg. She prescribed Meloxicam to try to obtain better pain control, and informed Plaintiff he would be beginning physical therapy soon. Plaintiff was seen in at his orthopedic clinic on November 17, 2022, and attended physical therapy on November 18, 2022.

On November 28, 2022, Defendant Ryan saw Plaintiff again related to this complaint and increased Plaintiff's Gabapentin at the suggestion of Plaintiff's orthopedist. Defendant Ryan saw Plaintiff again a week later, on December 5, 2022, and noted that it would take a month to notice the difference in the increased Gabapentin dose. Approximately six weeks later Plaintiff was seen by an orthopedic physician's assistant who noted that no further follow up was needed for Plaintiff's left knee and that she had taken X-rays/bone scanogram to address Plaintiff's concern regarding leg length discrepancy. Approximately six weeks later Defendant Ryan examined Plaintiff again noting that she had requested the results of the bone scanogram and that it reflected a 2.9cm leg length discrepancy. Defendant Ryan noted that based upon these results she requested a follow up appointment with the orthopedic surgeon to discuss this finding with Plaintiff and make a recommendation as Plaintiff continued to report knee and low back pain.

The record does not reflect that Defendant Ryan acted with deliberate indifference. Rather, the record shows that Defendant Ryan examined Plaintiff, did not observe a clear leg length discrepancy and opined that Plaintiff's back pain was likely related to Plaintiff's compensating for his left knee pain. She then tried several different pain medications to try to

address Plaintiff's pain and indicated he was scheduled for physical therapy. While Defendant Ryan's failure to appreciate the 2.9 cm leg length discrepancy might at most amount to negligence it does not rise to the level of deliberate indifference. There is no indication Defendant Ryan was subjectively aware that Plaintiff had a leg length discrepancy or that such discrepancy created an excessive risk to Plaintiff's health or safety and that she chose a course of treatment in conscious disregard to an excessive risk to Plaintiff's health. Furthermore, once Plaintiff underwent the bone scanogram to assess for a leg length discrepancy at the orthopedic clinic a few months later, the record shows Defendant Ryan reached out to obtain the results and requested a follow up with Plaintiff's orthopedic surgeon regarding this issue.

With respect to Plaintiff's claims against Defendants Jackson (Health Services Manager (HSM)), Alex Costa (Facility Medical Director (HSM2)), and Mark Eliason (Health Services Deputy Assistant Secretary) for denying his grievance/resolution request and appeals, the record likewise does not reflect that these Defendants were deliberately indifferent to a serious risk of harm to Plaintiff with respect to the treatment of his knee pain or the treatment of his leg length discrepancy and pain in his back, leg, and hip.

In general, "[i]n order to be liable under § 1983 a prison official must have done something more than fail to correct an alleged violation brought to their attention in a grievance after the violation has occurred." *Hardney v. Moncus*, No. C15-1842, 2016 WL 7474908, at *6 (E.D. Cal. Dec. 28, 2016) (citing *Taylor*, 880 F.2d at 1045 (upholding dismissal of defendant when plaintiff failed to provide facts showing defendant knew of and failed to prevent constitutional violations)); *Anaya v. CDCR*, No. C16-00040, 2016 WL 7178527, at *5 (E.D. Cal. Dec. 8, 2016) ("[T]he denial of a prisoner's administrative appeal generally does not cause or contribute to the underlying violation." (citing *George v. Smith*, 507 F.3d 605, 609 (7th

Cir. 2007)); *May v. Williams*, No. C10-00576, 2012 WL 1155390, at *3-4 (D. Nev. Apr. 4, 2012) (finding that merely denying grievances is not enough to establish a constitutional claim).

As discussed above, the record does not reflect that Defendant Ryan acted with deliberate indifference with respect to Plaintiff's pain or complaints of leg length discrepancy and Plaintiff does not identify any other treating providers as providing inadequate treatment. *See Anaya v. CDCR*, No. C16-00040, 2016 WL 7178527, at *5 (E.D. Cal. Dec. 8, 2016) ("Absent facts sufficient to show that a constitutional violation occurred in the first place, Plaintiff cannot pursue a claim for review of the administrative appeal grieving the underlying allegations."). Furthermore, at the time Defendants Costa, Eliason and Jackson, reviewed Plaintiff's grievances, the records reflected that Plaintiff had been seen by providers at MCC Health Services, including Defendant Ryan, on numerous occasions and his complaints of pain were addressed with attempts to prescribe different non-narcotic pain medications to better control Plaintiff's pain. The records also reflected that Plaintiff was scheduled for or had recently been seen by outside providers including Plaintiff's orthopedic clinic and physical therapy. The record does not reflect that Defendants Costa, Eliason, and Jackson knew of and disregarded an excessive risk to Plaintiff's health or safety in denying Plaintiff's grievances.

## CONCLUSION

In sum, after reviewing the relevant record, the Court finds Plaintiff has failed to rebut Defendants' showing that no genuine issue of material fact remains in this case. Therefore, the Court recommends Defendants' motion for summary judgment (Dkt. 21) be GRANTED and the case be DISMISSED with prejudice.

//

//

1

**OBJECTIONS AND APPEAL**

2          This Report and Recommendation is not an appealable order. Therefore, a notice of

3    appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the

4    assigned District Judge enters a judgment in the case.

5          Objections, however, may be filed and served upon all parties no later than **November**

6    **17, 2023.**  The Clerk should note the matter for **November 17, 2023**, as ready for the District

7    Judge's consideration if no objection is filed.  If objections are filed, any response is due within

8    14 days after being served with the objections.  A party filing an objection must note the matter

9    for the Court's consideration 14 days from the date the objection is filed and served.  The matter

10   will then be ready for the Court's consideration on the date the response is due.  The failure to

11   timely object may affect the right to appeal.

12         DATED this 27th day of October, 2023.

13

14   _____
     BRIAN A. TSUCHIDA
15   United States Magistrate Judge

16

17

18

19

20

21

22

23

REPORT AND RECOMMENDATION - 24